## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF GAVLESTON

| | | |
|---|---|---|
| **VERONICA L. DAVIS** | § | |
| **JEFF KITCHEN, AND THE** | § | |
| **CHARLIE BROWN HERITAGE** | § | |
| **FOUNDATION** | § | |
| | § | |
| **VS.** | § | **NO.  3:22-cv-00038** |
| | § | |
| **LUMENS TECHNOLOGIES, INC** | § | |
| **CENTURYLINK** | § | |
| **DIRECTV AND AT & T** | § | |
| **CREDENCE MANAGEMENT AND** | § | |
| **SEQUEIM ASSET SOLUTIONS** | § | |

## <u>PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW, VERONICA L. DAVIS**, and for cause of actions would show

the following:

1.      Plaintiff, Veronica L. Davis[1], is a citizen of Texas, residing in West

Columbia, Texas, whose address is 226 N. Mattson, West Columbia, Texas 77486.

2.      Plaintiff, Jeff Kitchen, is a citizen of Florida residing at 67 Fall Drive,

Port Orange, Florida 32129.

3.      Plaintiff, Charlie Brown Heritage Foundation is a nonprofit

---

[1]  All references to Plaintiff shall be to Veronica L. Davis.  References to the other
Plaintiffs will be designated as Plaintiff, followed by the name of said Plaintiff.

corporation, whose principal place of business is 300 W. Bernard Street, West Columbia, Texas 77486, but whose mailing address is 222 N. Mattson, West Columbia, Texas, 77486.

4.     Defendant, CenturyLink, Inc [2] is a Louisiana telecommunications corporation, headquartered in Monroe, Louisiana, whose address is 100 Century Link  Blvd, Monroe, Louisiana 71203.  Its registered agent for service is C.T.Corp, 1999 Bryan, Dallas, Texas,  75201-3136.

5.     Defedant, CenturyLink, hereinafter referred to as CL, has repackaged/renamed itself as Defendant, Lumen Technologies, since the incidents made the basis of this lawsuit,  and is a Louisiana telecommunications corporation, headquartered in Monroe, Louisiana, whose address is  100 Century Link  Blvd, Monroe, Louisiana 71203.  Its registered agent for service is C.T.Corp, 1999 Bryan, Dallas, Texas.

* 6.    Defendant has notified Plaintiff that both CenturyLink and Lumen Technologies are parent companies of the company with whom Plaintiff, Veronica Davis contracted and therefore are not the proper parties.  After notification of Defendant's response, counsel for Central Telephone Company of Texas, hereinafter referred to as (CTC) and CenturyTel Broadband Services, LLC, hereinafter referred to as( CBS) finds that CenturyLink and Lumen Technologies are still necessary parties,  due to the

---

[2]  All references to Defendant is to CenturyLink, CTC, or CBS unless otherwise specified. References to the other Defendants will be referenced as Defendant, followed by the name of same.

pleadings of these Defendants (CL, CTC, and CBS)  which indicate that Plaintiff is

precluded from bringing an action against them due to a class action suit involving

CenturyLink and Lumen Technologies, Inc.

It is important to note and Plaintiff retains the parties CenturyLink and Lumen

Technologies because Defendant, CenturyTel Broadband Services and Central Telephone

Company has raised the issue that Plaintiff is precluded from filing suit due to a class

action lawsuit in Minnesota, therefore pleading res judicata. Res judicata does not apply

to persons who were not parties to an action.  Therefore, the issue regarding proper

parties must be addressed by this Honorable Court.

7.    Regarding CenturyLink's status as a party, the Minnesota suit pleads and

Plaintiff herein adopts the following assertion:

*18. When other subsidiaries—such as Embarq—have been added to the
Company, the Company has confirmed those subsidiaries will operate
"under the corporate name CenturyLink…" CenturyLink did so to assure its
customers that they were dealing with a large, national, public company
who would stand behind its word and commit to linking the country
together.8

*19. The CenturyLink name is on every uniform, truck, envelope, an NFL
Stadium,
and confirmed in telephone conversations with its customers. Customers
write their checks to Century Link.  Plaintiffs and the Class reasonably
believed they received  representations, promises, and services from
CenturyLink and no one else. And that was the Company's      intention.9

8.    Moreover, the coverage map contained in the Class Action suit shows that

Century Link covers and services the area in which Plaintiff obtained service, rather than

any other entity.



Consequently, due to the Rule 12(b)(6) Motion to Dismiss by Defendants CTC and CBS, Plaintiff retains CenturyLink and Lumen Technologies, for the aforementioned reasons.

9.      By stipulation of the parties, Plaintiff herein joins the following "corrected parties in addition to CenturyLink and Lumen Technologies, its parent company, at the time of the incidents made the basis of this suit.  The firm of Parsons, McEntire, and McCleary PLLC, whose address is One Riverway, Suite 1800, Houston, Texas 77056 has accepted service and issued a Waiver of Summons in this cause on behalf of CenturyTel Broadband Services, LLC and Central Telephone Company of Texas.

10.      DirecTV, hereinafter referred to as DTV, is a corporation whose principal place of business is located located at 2230 E. Imperial Hwy, El Segundo, California

90245.  It may be served with service or process through its registered agent for service, Corporation Service Company d/b/a CSC Lawyers Incorporating Service Company.  The service address for said registered agent is 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

11.    The Corporate Disclosure Statement of DirecTV indicates that DirecTV, LLC is a wholly owned subsidiary of DirecTV Holdings LLC.  Plaintiff is unable to ascertain from the Corporate Disclosure Statement whether the right party has been sued. However, Kilpatrick, Townsend, and Stockton, LLP, 2001 Ross Avenue, Suite 4400, Dallas, Texas 75210 has responded on behalf of both DirecTV and A T & T.

Plaintiff herein amends its Petition to include as parties DirecTV Holdings, LLC.

12.    AT & T, hereinafter referred to as ATT is a corporation whose principal place of business is at 208 S.  Akard St., Dallas, Texas .  At the time of the incidents made the basis of this lawsuit, it is believed that A T & T and  DirecTV merged, thereby making DirecTV either a wholly owned subsidiary of AT & T or some other entity within or under the umbrella of AT& T.

The Corporate Statement indicates that A T & T Corp or A T & T Inc. is the correct party and that A T & T Corp is a wholly owned subsidiary of A T & T, Inc., a Deleware Corp.  Kilpatrick, Townsend, and Stockton, LLP, 2001 Ross Avenue, Suite 4400, Dallas, Texas 75210 has responded on behalf of both DirecTV and A T & T.

13.    Credence Resource Management, hereinfter referred to as Credence or

CRM, is a corporation or business entity, organized in Georgia, which acts a collection

agent for either A T & T, DirecTV, or both. Its principal place of business is 4222 Trinity

Mills Rd., Suite 260 Dallas, Texas 75287. The Corporation Service Company d/b/a CSC

Lawyers Incorporating Service Company is the registered agent for service. The service

address for said registered agent is 211 E. 7th Street, Suite 620, Austin, Texas 78701-

3218.

14.    Sequeim Asset Solutions, LLC, hereinafter referred to as Sequeim, is a

corporation or business entity, organized under the laws of Georgia, which acts a debt

collector or collection agent for either A T & T, DirecTV, or both. Its registered agent for

service is Chelsey Martine, acting as vice president for Corporation Service Company

d/b/a CSC Lawyers Incorporating Service Company. The service address for said

registered agent is 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

15.    The amount in controversy exceeds $1,000,000.00.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. §§ 1331 and 1332. This Court has supplemental jurisdiction over

Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

17.    Defendant, CenturyLink, subsequently rebranded or renamed

Lumens Technology is a corporation organized under the laws of the State of Louisiana.

Therefore diversity of citizenship exists. Because it was operating as CenturyLink during

all the actions referenced herein, the name CenturyLink (CL) will be used throughout this petition.  Where an action complained of is the result of the local company servicing Texas, same shall be noted by Central Telephone Company of Texas( CTC) or CenturyTel Broadband Services (CBS).   *Where Plaintiff is unable to ascertain which of these three defendants is culpable, all three of the foregoing are referenced, including Lumens whether named or not.

Various companies and/or corporations, have been induced to participate by and have participated with the defendant in the offenses charged in this complaint and have performed acts and made statement in furtherance thereof.

18.    Plaintiff secured services from  Defendants, Central Telephone Company of Texas and/or CenturyTel Broadband Services, LLC which provided telephone and internet services to Plaintiff at her office in Brazoria County, Texas under the name or auspices of CenturyLink.

19.    Venue is proper in Brazoria County, Texas and therefore the Southern District of Texas, Galveston Division has jurisdiction and venue in this matter. Additionally, this Court has personal jurisdiction over Central Telephone Company of Texas or CenturyTel Broadband Services, LLC because said Defendants conduct business in this District and has sufficient minimum contacts in this District. Central Telephone Company of Texas or CenturyTel Broadband Services, LLC intentionally avails itself of this jurisdiction by transacting business and deriving substantial revenues from business

activity in this District.

20.     Likewise, this Court has personal jurisdiction over DirecTV because it conducts business in this District and has sufficient minimum contacts in this District.

21.     Likewise, this Court has personal jurisdiction over A T & T because it conducts business in this District and has sufficient minimum contacts in this District

22.     Therefore, venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c), as a substantial part of the events or omissions giving rise to this claim or a substantial portion of the property involved in this case was due to the business transacted in Brazoria County, Texas by CenturyLink, CTC, CBS,  DirectV and A T & T.

23.     Both Sequeim Asset Management and Credence Resource Management, though incorporated in other states, had sufficient minimum contacts with this State by attempting to collect an alleged debt in the State of Texas by both mail and telephone.

## CAUSES OF ACTION

24.     Plaintiffs bring this action pursuant **47 C.F.R. § 64.2401**; the **Fair Credit Reporting Act codified at 15 U.S.C. § 1681 et seq** , the **Fair and Accurate Credit Transaction Act 15 U.S.C. § 1681 et seq** and the **Fair Debt Collection Practices Act** 15 U.S.C. 1692 et seq.  Plaintiffs bring supplemental claims for breach of contract (express and implied), violations **Texas Business and Commerce Code** (Texas Deceptive Trade Practices Act, fraud, fraudulent inducement and negligent misrepresentation.

## FACTUAL BACKGROUND AND CLAIMS

25.    Plaintiff obtained telephone services from Embarq in or around 2004 in West Columbia, Texas, the situs of both her home and office.

In the City of West Columbia, Texas, the telephone service company's name changed numerous times, finally becoming CenturyLink or Century Telephone Company of Texas in or around  2009.  Plaintiff was a customer of  Embarq at the time of CenturyLink's, CTC, or CBS's  acquisition of Embarq. CenturyLink has market presence in 37 states[3]  as indicated  on its website . [4]

26.    The primary party in the CenturyLink class action suit involved CenturyLink and Qwest, as shown on the map set forth supra, rather than CTC .  Said suit did not involve businesses or entities served by Century Telephone Company of Texas (CTC) or CenturyTel Broadband Services, LLC (CBS).

27.    Central Telephone Company of Texas and CenturyTel Broadband Services, LLC, and CenturyLink sells a variety of products and services to its customers , including high-speed internet, local and long distance telephone services.  It also sells/sold television services in West Columbia, Texas at the time of the transactions leading up to a termination of Plaintiff's services. Said services were sold or marketed under the name

---

[3]https://broadbannow.com

[4]  See Network map supra

CL.[5]

28.    During the time that Plaintiff had telephone and internet service with Defendant (CL/CTC), she found said services to be either problematic or inadequate in the following respects:

a.    CTC, CBS  or CL overcharged for telephone and internet services;

b.    Billing was inconsistent.  Specifically, Plaintiff subscribed to a fixed pricing plan in which the bill would remain the same monthly. However, it often varied.

c.    Each time, a change was made to Plaintiff's  telephone  service, (e.g. adding "At Ease, changing voice mail assistance, etc.).  Plaintiff lost telephone service usually for one entire day, no matter what the nature of the change was;

d.    Internet service was sketchy and often did not work, at all.

e.    CL, CBS and/or CTC did not provide services at the internet speed at which it guaranteed the consumer/Plaintiff.

29.    Plaintiff was also charged irregular billing fees for items that were encompassed  in regular billing.  For example, Plaintiff had unlimited long distance in her

---

[5]  All references to CTC or CBS, also refer to CenturyLink, as well, as Plaintiff is unable to ascertain at this juncture who is actually responsible for the actions which resulted in this cause of action.  Nor is Plaintiff able to differentiate between the actions of CTC and CBS, but presumes that internet issues relate to CBS.

package, however, CTC began billing a long distance weekend charge. Further details are outlined infra.

30.     A Minnesota class action lawsuit against Century Link outlines some of the same issues.  Said case was filed as Cause  No.  MDL NO. 17-2795 MJD/KMM   and entitled IN RE Centurylink Sales Practices and Securities Litigation. CONSOLIDATED CLASS ACTION COMPLAINT.  References will be made throughout this pleading regarding said suit or extractions made from the pleadings of same.

31.     Pled therein , Paragraph 18 of said complaint states:

> *18.   CenturyLink promoted fixed monthly rates for certain stand-alone and bundled services, including high-speed internet and local and long distance telephone services. While the Company routinely promoted its simple, low rates to customers, it was fully aware that those low rates would not be delivered.[6]

32.     In addition to having billing problems, Plaintiff also had problems with spotty internet service, which often included inability to access the internet discussed further infra, which is most likely the result of poor services provided by CBS.

33.     Plaintiff complained to Defendants regarding internet problems and her inability  to access the internet properly and at times, not at all. CL, CBS, or CTC  advised that a new modem was needed and charged a one time fee of $100.00.  However, the new modem did not eradicate the problem

---

[6]   It should be noted that the pleadings in this suit stems from investigations into CenturyLink by Attorney Generals of various states, along with other state entities.

-11-

34.    CTC or CBS's technical support person, during one attempt at resolution of an internet issue advised Plaintiff that her internet was  operating at only 10%.  Same was confirmed by a CenturyLink technician/ repairman who came out to repair the line. As a result, Plaintiff was not receiving internet services  at the speed or efficiency contracted for.

Subsequent to the repairs,  problems continued with the internet. Additional complaints were noted and reported on April 20, 2018 and again on June 28, 2018.

The class action Minnesota complaint contends:

The ongoing corporate decision not to integrate the internal computer systems has resulted in a byzantine system where it was impossible to uniformly access and share information across the myriad platforms and computer systems that comprise CenturyLink. As counsel for Defendant represented to the Court:

Plaintiff contends that it is this same failure to integrate its systems was pervasive in its internet functions as well.  Same resulted in internet transmission problems outlined in this complaint.

**Telephone billing services**

35.    The class action complaint filed in Minnesota accuses CenturyLink of :

running an aggressive boiler room sales operation and a sham  customer service process. Through its model, CenturyLink routinely promised low prices during the sales process only to charge higher amounts and add unauthorized charges during billing. These practices bilked customers out of tens of millions of dollars.

Plaintiff contends that the same thing happened to her.

2.     Paragraph 2 of said complaint states:

CenturyLink has sought to minimize its customers' concerns as mere "billing disputes." But this action is not about mere billing disputes. It is about CenturyLink's
uniform business model; the generate-sales-at-all-costs programs it forced on its sales offices and employees, the reckless incentive programs it perpetuated, and the rampant customer abuses that necessarily resulted.

Plaintiff contends that she has also been the victim of same.

36  Plaintiff was also charged irregular billing fees for items that were encompassed in regular billing.  For example, Plaintiff had unlimited long distance in her package, however, CL began billing a long distance weekend charge which was already included in her long distance package.

37.     Additionally, Century Link had a pattern and practice of adding and removing services and/or stating that the service was included in another service.  For example, Defendant indicated that "line guard" which protected the consumer for costs associated with repairs for wire maintenance was contained in its "At Ease" service. However, when repair service was necessitated, CL or CTC indicated that the charges for the service was not included with " At Ease" and/or that Plaintiff did not have lineguard. More than one CL "operator" advised that both products, "At Ease" and "lineguard" were duplicative and therefore not needed.  Several "operators" also indicated that computer services and tech support therefore were included in the "At Ease" package.

38.     In spite of having these services, when Plaintiff called for repair services, Century Link indicated that the consumer/Plaintiff would be charged because said service

was not contained in "At Ease."  At times, Plaintiff was billed for both At Ease and Line Guard for repairs.

39.    Due to the myriad problems,  Plaintiff decided to  discontinue her telephone services, even though same was essential to her business.  Plaintiff determined that fluctuations in monthly billing which were contrary to Defendant's fixed price plan, coupled with spotty internet service, and overall dissatisfaction with the services provided (or lack thereof) by Defendants CTC, CBS, or CL resulted in said decision.

40.    Consequently, in or around January or February, 2019, Plaintiff, contacted CenturyLink.[7]  Plaintiff had specifically requested that services be discontinued on the day after her call.  Plaintiff made such request in order to retrieve and record all messages in her voice mailbox.

41.    Because services were terminated on the same day, rather than the following day,  Plaintiff contacted  CenturyLink or CTC in order to obtain message retrieval. CL's Loyalty Department urged Plaintiff to retain/reinstate her service and made her  an offer to remain with her current plan, coupled with  DirecTV, at a lesser rate than Plaintiff was already paying.  Said rate was to be either $97.00 or $102.00 per month for a bundle, including all the services she already had (phone service and  internet) with the addition of satellite television services from DirecTV. [8]

_____

[7]  CenturyLink was the name stated by the personnel answering the telephone. )

[8]   Both numbers appear in the notes of the telephone call. Plaintiff accepted the offer.

42    Plaintiff would show that she was promised one rate during the sales process but was charged a higher rate when actually billed and  was charged unauthorized fees, including billing for services not ordered.

**Failure to remedy on part of CenturyLink**

43.    Upon initial complaint, the CTC or CL's agent failed to remedy the wrongful charges and remove the improper charges from the bill, whether the charges were for CL/ CTC charges or DTV charges.   Plaintiff was instead directed to contact DirecTV to sort out this billing issue.

44.    With each (CL, CTC) agent or supervisor that Plaintiff spoke with, said agent or supervisor for CenturyLink or its subsidiary, CTC  had a pervasive and persistent practice of: denying that original prices quoted had ever in fact been quoted, that the prices  or services previously offered were impossible to provide at the rate quoted to Plaintiff, thereby refusing to honor price the contract price promised. CL further denied that the new modem was unnecessary and should therefore not be returned[9].

45.     Moreover, the CenturyLink supervisor and other representatives claimed that the company's computer systems either did not show any record of such complaint calls or  what Plaintiff and CL had discussed

—————————————

[9] Defendant induced Plaintiff to purchase a new modem, attributing internet problems to an old modem. Plaintiff asserted that the new modem had not improved the quality of the internet service.

-15-

Plaintiff provided dates and names of persons she had spoken with and asked for copies of the "calls from a recorded line" of which Plaintiff was advised was occurring. Some "operators" indicated that they could see that a discussion had been had, but they could see the contents of the discussion. Others claimed to see nothing.  Same is consistent with the assertions in the Class Action lawsuit which reads thusly:

Paragraph  68 of said complaint indicates the following:

The ongoing corporate decision not to integrate the internal computer systems has resulted in a byzantine system where it was impossible to uniformly access and share information across the myriad platforms and computer systems that comprise CenturyLink. As counsel for Defendant represented to the Court:

[i]t happens to be the case that these systems have, in many cases, are [sic] not combined, and so those of us that have worked for the company for many years have been surprised at times to see how difficult it is to retrieve information because there is not a push of a button, as one might think there is.14 (Tr. of Initial Status Conference, on Dec. 14, 2017, by CenturyLink counsel, Doug Lobel, at page 35.

46.    Pursuant to the Minnesota a class action lawsuit filed against CenturyLink, the following , it was alleged therein and in this cause of action as well:

47.    *Paragraph 67 of said complaint indicates that the following:

But as CenturyLink expanded, it chose not to adequately invest in      technologies that would integrate the platforms from its various acquisitions into one cohesive sales and billing system.  Same resulted in a system where information was not properly shared amongst its various systems whereby a customer can adequately discuss previously held conversation or rate quote with another individual who subsequently reviews an account.  (Tr. of Initial Status Conference, on Dec. 14, 2017, by CenturyLink counsel, Doug Lobel, at page 35.

48.     In speaking with one supervisor, said supervisor assured this Plaintiff that she could not have been offered a bundle price as quoted by Plaintiff because same would been below the amount that each service could be offered alone.  Therefore, she intimated that Plaintiff must be lying, as the price quoted was basically a mathematical impossibility.  CenturyLink or CTC then tried to negate its offer and suggested a different, more expensive offer that it wanted Plaintiff to take.

49.     Because Defendant failed to include all information regarding pricing and billing in its verbal offer,  Plaintiff agrees with and adopts Paragraph 72 of the Minnesota Class Action Original Petition which reads thusly:

> Any conditions required to qualify for the lowest quoted price, such as signing up for autopay, agreeing to modem rental, or payment of additional fees and taxes, are routinely omitted from the sales pitch, either because the sales agent wishes to present the price as low as possible to land the sale or because the system itself does not provide all of the needed information.

50.     Plaintiff then sent a letter to CenturyLink outlining the  billing problems . Same is attached as Exhibit A, and incorporated by reference, the same as if fully copied and set forth herein.

51.     After no response?, Plaintiff then resorted to contacting someone else in CenturyLink.  Upon complaining, Plaintiff was advised that she had been afforded one credit and would not be afforded another.

52.     Upon failure of that contact to result in changes, Plaintiff sent a letter of

complaint to CenturyLink Headquarters in Monroe, Louisiana. After the first responses failed to resolve the problem, the matter was escalated to Chadwick Woods of CenturyLink's corporate office. Some of the correspondence with Woods is attached herein as Exhibit B, and incorporated by reference, the same as if fully copied and set forth herein.

53.    Mr. Woods removed most of the improper charges and Plaintiff paid the balance thereon. Plaintiff was allowed all offsets and credits which he (Woods) deemed proper or that the parties discussed. Plaintiff paid the remaining balance, making the account balance -0-.

54.    However, the following month, CenturyLink billed the Plaintiff at a higher rate, rather than the rate quoted. It appears from the next month's bill which followed said credits, that some of the credits were reapplied.

55.    Plaintiff contends that said actions were commensurate with the allegations contained in the Class action lawsuit and adopts same herein:

> 12.    Even where CenturyLink representatives might, when pressed, agree to credit a customer's account for an improper charge, those credits were routinely rejected by supervisors and not applied or were removed only to be reapplied the following month.

Plaintiff contends that she was subjected to same.

Said complaint also contains the following language:

"As a consequence, CenturyLink now faces dozens of lawsuits accusing it of consumer fraud, deceptive sales practices, breach of contract, negligent misrepresentation, fraudulent inducement, and unjust enrichment.

-18-

56.    Plaintiff attempted to contact Woods again.  However, follow-up emails went unanswered.  In October, 2019, Plaintiff again notified Woods by call and email. He failed to respond to calls and emails.  See Exhibit C, attached and incorporated by reference, the same as if fully copied and set forth herein.

57.    In spite of the failure of Mr. Woods to further discuss said issue or respond, Plaintiff refused to pay the billed amount, but rather paid the amount agreed to upon initiation of services.

58.     In January, 2020, Plaintiff notified CenturyLink to discontinue service.  In addition thereto, Plaintiff also sent a certified letter to both CenturyLink and DirecTV.[10] (See Exhibit D , attached and incorporated by reference, the same as if fully copied and set forth herein-).

## DIRECTV

59.    It should be noted that billing issues with DTV are also incorporated section regarding billing issues section of this complaint and overlap in time frames. However, in effort to delineate between various acts of Defendants for ease of understanding, the complaint attempts to separate where possible issues related to each cause of action.

60.     It should be further noted that the Minnesota  class action suit does not refer

---

[10]  Only the letter to CenturyLink is attached as an attached Exhibit.

to any billing irregularities regarding services provided by DirecTV.  Nor does same

contain any allegations of bundling problems in connection with any television satellite

service provider.

61.    CenturyLink offered DirectV satellite services to remain with CL

when Plaintiff sought to terminate her services.  Plaintiff accepted the offer for the

amount agreed to, which was either $97.00 or $102.00 per month, including internet,

unlimited long distance, and satellite service.

62.    Additionally, Plaintiff was charged for equipment which Plaintif

ordered which would allow the ordered item, a  "mini genie"  to be  moved from one

room to another and from one television to another,  Plaintiff learned, when she

subsequently attempted to move same,  that the mini genie  had been hardwired and was

incapable of being moved- therefore being dedicated to the television on which it was

installed.

Plaintiff contends that same resulted in billing for a service that was fake or never

delivered and requested that Defendant remove the $99.00 fee billed for same.

63    Plaintiff contacted CL (CTC) regarding said issue. Upon initial

complaint, the agent failed to remove and remedy the improper charges from the bill.

Moreover, said agent  instead , directed Plaintiff to contact DirecTV to sort out this

billing issue.  Instead Plaintiff contacted both DTV and CL.

64.    One such example involves telephone call on August 19, 2019, in which

Plaintiff objected to billing for a regional sports fees. Upon learning of same, Plaintiff demanded that same be removed from her bill due to lack of agreement thereto, nonuse of sports channels, failure to purchase a package which included sports, and Plaintiff's disdain for the field of sports. Plaintiff was told that the fee was not optional, but rather mandatory for having DirecTV, and therefore, the fee would not be removed, stating further that the time to contest the fee expired at or near the time of entering into a contract for services. [11]

65.    According to the information provided, a DirecTV protection plan was also included which was not ordered by the Plaintiff. Plaintiff contends that CenturyLink, CTC and DTV either acted in concert or CenturyLink and CTC acted as an agent for DTV in its plan to raise pricing for television satellite services, while purporting to provide a discount to its (CenturyLink) customers. [12]

66.    Consequently, Plaintiff, discontinued DTV due to the aforemention-ed issues, as well as other issues regarding installation. DTV discontinued Plaintiff's service, but sent a separate bill. It appears that either due to Plaintiff's direct correspondence with DirecTV or CenturyLink's notification of the discontinuation of services, DirecTV sought payment directly. Moreover, DTV maintained that it was still

---

[11] According to the representative, contesting the fee would have been required prior to being billed for the fee and at such a time when the Plaintiff would have no knowledge of said fee.

[12] Cl, CTC, &/or CBS avowed that bundling offered larger discounts for its customers, than said service would costs on the open market by direct purchase.

providing satellite services to Plaintiff.  Services had been discontinued, in spite its assertions to the contrary. [13]   Additionally,  DTV failed to remove the dish on Plaintiff's house and old ones in her yard, and wiring stapled to the house, as requested by Plaintiff and to date, has still failed to do so.

67.    After Plaintiff's tender of complaint letters and demand letters to DTV, Plaintiff sought arbitration with DirecTV.  Finally, on June 22, 2020, DirecTV called indicating that it would -0- out Plaintiff's account and not report any negative information to the credit bureau via voicemail.

**Referral to collections**

68.    DirecTV discontinued Plaintiff's service, but sent a separate bill, alleging that services were still being provided.  Plaintiff sought arbitration with DirecTV, pursuant to its protocol.  However, DirecTV did not participate in arbitration but rather agreed to zero out Plaintiff's alleged balance. On June 22, 2020, DirecTV called indicating that it would -0- out Plaintiff's account and not report any negative information to the credit bureau via voicemail.

In spite of said attestations, DirecTV or A T & T, after discontinuing service turned the account over the Credence Management and Sequiem Assets Solutions for collection, at different times.   Same was noted on Plaintiff's credit report.

A subsequent reporting of a negative account on Plaintiff's credit report led

---

[13] DTV billing was on the CL telephone bill.

Plaintiff to seek to ascertain the nature of the charges and from whence they originated.

Plaintiff learned that it was an A T & T charge.  Plaintiff was unaware of the origin of

said charge, as A T & T did not  service the area in which Plaintiff resided or worked.

The causes of action associated with the actions of A T & T and DirectTV are

further set forth in infra in violation of 15 U.S.C. §1681 s-2.

69.     In spite of Plaintiff terminating her account, CenturyLink or CTC continued

to bill for its services, however.  CenturyLink had  discontinued internet service, but

would not turn off the phone and continued to bill Plaintiff, even though she has ceased to

pay for service and even though Plaintiff has requested that service be discontinued.

CenturyLink had left phone messages instructing Plaintiff to pay or services would be

discontinued.  However, it failed to do so.

70.     Plaintiff contends that Defendants, CL and CTC, refused to discontinue

services, as requested for the sole purpose of providing a legal basis for  Defendant to

proceed with a counterclaim or offset against Plaintiff for any recovery in this or any

other action she might bring, as Plaintiff had threatened legal action to resolve the issues

outlined herein.  In the alternative, Plaintiff contends that same was done due to

Defendant, CL, being the subject of a Class Action suit and its actions were under

investigation and scrutiny by the courts and various Attorney Generals of various states.

**Efiling Issues and Impact on Cases**

71.     Plaintiff is an attorney.   Consequently, telephone services are essential

to her business.  Moreover, as an attorney,  Plaintiff was/ is required to file
documents via efiling.

72.    Plaintiff contends that she lost two cases due to problems with telephone
and internet service in the Southern District of Texas, Galveston Division.  Specifically,
Plaintiff cites two cases in which documents were not timely submitted due to
transmission/internet issues.

Moreover, Plaintiff  settled another case for far less than she would have received
a jury award on in a disability discrimination case.  Due to the observations of another
client regarding the treatment and disdain of the Court for reported filing issues.

73.    Plaintiff was unable to file the Exhibits to an Opposition to a Defendant's [14]
Motion for Summary Judgment in one of her cases.  Same was due to faulty internet
service. Though the pleading in chief went through, the exhibits did not.[15] Though
counsel, Plaintiff, Davis,  explained same to the Court, the Court refused to accept  the
exhibits which were filed the following day.  Plaintiff contends that failure to timely file
the exhibits was due to faulty internet service provided by Centurylink or CBS, in whole
or in part.

74.    In a case involving Jeff Kitchen vs. BASF filed in the Southern District,

---

[14]  The Defendant referenced herein was a Defendant in another unrelated case and
does not involve any of the Defendants in this cause of action.

[15]  Plaintiff mistakenly believed that same was due to exhibit size and stated such
to the Court.

-24-

Plaintiff was unable to file documents in his cause.  Plaintiff, as counsel for Plaintiff, Kitchen, timely submitted an Opposition to Summary Judgment or some other document. However, the exhibits did not transmit.  Plaintiff contends that Plaintiff, Kitchen would have or should have had his responses considered. But for the failure of the documents to transmit properly, the Court refused to accept the documents.

75.    Plaintiff contends that the Defendant in that case could not meet its burden of proof and had no evidence to support its contention for termination.  In fact, the evidence was clear and unequivocal that the reasons set forth by the Defendant in that cause were proven to be false.

76.    A demand had been made pertaining to Plaintiff. Kitchen for a sum of $1,000,000.00, which included his lost wages  to date of demand, moving expenses, and the loss of his home and retirement benefits at the time of the demand.

77.     Had the case made it to the trial phase, Plaintiff contends that Kitchen would have received a sum in excess of $2,000,000.00 at minium, given the additional damages that he had incurred from the time of the demand to the date of trial.

78.     Moreover, had the Court not  admonished Plaintiff regarding the incredulity of her claims regarding internet service, the outcome of the case,  would have in all likelihood, been rendered in favor of Plaintiff, Kitchen, as the Court would have examined the information tendered by Plaintiff in its Motion for Summary Judgment, as well as information tendered by Plaintiff in its  Opposition to Defendant's (in that case)

Motion for summary judgment). Plaintiffs, Davis and Kitchen contend that same is the result of the faulty internet service provided by CL, CTC, and CBS. Therefore, said Defendants are responsible for all damages to both Plaintiffs (Davis and Kitchen) resulting therefrom.

79.    Plaintiff contends that a similar incident happened in another case involving Plaintiff, Charlie Brown Heritage Foundation, in the same Court. Internet problems resulted in transmission problems which delayed the tender of exhibits by one day, with the court deeming same to be untimely. Said case would have netted Plaintiff, Charlie Brown Heritage, at a minimum of least $150,000.00 per defendant (2) for a total of $300,000.00 up to a maximum of $600,000.00. (Statutory limits).

Plaintiff contends that if the Court had accepted said exhibits, it would not have subsequently dismissed Plaintiff's case.

80.    Due to the cause being dismissed, Plaintiff, Charlie Brown suffered damage to its property, including water damage, glass breakage, vandalism, and other property damage, along with deterioration to its buildings due to failure to obtain settlement proceeds or a jury award which would have resulted in building rehabilitation. Same would not have occurred but for the acts of Defendants, CL, CTC, Or CBS.

81.    Plaintiff contends that the Court treated her with disdain and contempt because it did not believe her internet claims, thus prejudicing the Court in its assessment of the situation. In fact, Plaintiff was not even aware of the extent of the problem until

learning of the class action case against CenturyLink.

The actions of CL resulted in an unfair disadvantage to Plaintiffs and was of significance in the Court's decision to dismiss the causes of Kitchen and Charlie Brown Heritage Foundation.

82.    Plaintiff would show that the actions of CenturyLink impacted her ability to run her business and provide services to her clients. Plaintiff could in all likelihood have suffered more than monetary damages, including but not limited to sanctions or disciplinary action due to inadequate internet service provided by the Defendant, CenturyLink.  Plaintiff suffered severe emotional distress regarding the incidents surrounding the outcome of the foregoing referenced cases, as did her clients, Jeff Kitchen and the Charlie Brown Heritage Foundation.

Due to the foregoing, coupled with the inability to have adequate telephone, fax, and internet services, Plaintiff was forced to close her practice.

83.    Because CenturyLink and/or CTC and CBS has/had a monopoly on telephone services in city of Plaintiff's office, during the time of the incidents made the basis of this suit, Plaintiff was unable to obtain telephone services from any other carrier to maintain her business.

## CLAIMS FOR RELIEF

## VIOLATIONS OF  47 C.F.R. § 64.2401

84.    At all times relevant hereto, 47 C.F.R. § 64.2401, entitled **"Truth-in-**

**Billing Requirements**," provided, in relevant part, as follows:

> (b) Descriptions of billed charges. Charges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered. The description must be sufficiently clear in presentation and specific enough in content so that customers can accurately assess that the services for which they are billed  correspond to those that they have requested and received, and that the costs assessed for those services conform to their understanding of the price charged…

> (d) Clear and conspicuous disclosure of inquiry contacts. Telephone bills must contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill.

85.    The charges contained on CenturyLink or CTC's bills to Plaintiff were not accompanied by "clear, non-misleading, plain language description of the service or services rendered" nor did they "contain clear and conspicuous disclosure of [ ] information that the subscriber may need to make inquiries about, or contest, charges on the bill," in violation of 47 C.F.R. § 64.2401.

86.    Moreover, CenturyLink/ CTC billed for inappropriate or unjust charges, and charges exceeding the amount contracted for.  As heretofore stated, CenturyLink also collected for charges which were contained in other places on the bill or contained in/or subsumed in another charge, resulting in double or multiple billing for the same item.

CL billed for DTV.  Specifically, DirecTV billed for a sport fee not contracted for or authorized by Plaintiff.  Moreover, its fee included taxes, which was not disclosed during the sales pitch by CTC or CenturyLink.  DTV did not participate in the discussions between CL and CTC, when it contracted with Davis for satellite services.

87.    Plaintiff concludes that an agency relationship existed between DirecTV and CenturyLink or CTC, in which CTC sold packages for DirecTV to its customers. Plaintiff also contends that an agency relationship existed between DTV/ATT and Sequeim and CRM, as Defendants DTV and ATT retained the services of said debt collectors to collect debts on its behalf.

88.    In order to establish an agency relationship, Plaintiff need only show (1) the agent's authority to act on the principal's behalf and (2) the principal's right to control the agent. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017)." *Ahmed v. Bank of Whittier* (Tex. App. 2022).  It is clear through billing records, the statements made on the internet (see Exhibit E, attached and incorporated by reference, that DirecTV has vested authority in CenturyLink to act on its behalf in selling satellite services.

The existence of the agency relationship may be proven by direct testimony or by circumstantial evidence, such as the relationship of the parties and their conduct concerning the transaction at hand. *Kirby Forest Indus., Inc. v. Dobbs*, 743 S.W.2d 348, 356 (Tex.App.--Beaumont 1987, writ denied)." *Spangler v. Jones*, 861 S.W.2d 392 (Tex. App. 1993).

Dismissal prior to being allowed to develop that relationship during discovery is an act in contravention of the law.

89.    An agency relationship existed between CTC and DirecTV for the provision of television satellite services. DirecTV was the principal  and CTC the agent, with regard

to providing billing services for television packages and the selling of television packages.

In order to show an agency relationship, Plaintiff need only show the elements of an agency relationship--that is that there is a consensual relation whereby one party is to act for and on behalf of the other.  Such a relationship existed between Cl/CTC and DTV.

## FRAUD AND FRAUDULENT INDUCEMENT

90.    Plaintiff entered into a contract with CTC, acting as CenturyLink to keep her current phone services and internet, coupled with adding DTV satellite services  for approximately $97.00 per month.  Said offer induced Plaintiff to rely on said amount, accept the offer, and to continue services with CL/CTC/CBS.

91.     Said Defendants ( CL/CTC/CBS) fraudulently induced Plaintiff to accept the offer by promising one rate.  Nevertheless, Defendant billed Plaintiff at a rate higher than the one quoted, including those charges from or on behalf of DirecTV.  Acting on behalf of DirecTV, both Defendants (CTC & CL)  induced Plaintiff to accept a bundle package to include television services.

92.    Said  Defendant fraudulently and negligently misrepresented the billing plan and structure, and the services which would be included in the package.  Defendant included services, which increased billing costs, though none of these items were mentioned at the time of the offer/sales conversation, including additional charges

submitted and charged on behalf of DirecTV.  Same constitutes consumer fraud as the

Defendants (CTC. CL, & DTV) would  receive a higher dollar figure for the provision of

services which exceeded the agreed upon amount.  The alternative to rejection of said

services would be termination of said services.

93.    In addition to satellite service charges, CenturyLink had a pattern and

practice of adding and removing  services and/or stating that the service was included in

another service, as heretofore discussed.   For example, Defendant indicated that "line

guard" which protected the consumer for costs associated with repairs for wire

maintenance was contained in its "At Ease" service.

94.    Additionally, Plaintiff was promised certain benefits for accepting a bundle

(breach of contract) for less than what she was paying( fraudulent inducement) to prevent

her leaving or discontinuing services with CTC or CenturyLink.  Both CTC and DirecTV

are liable and responsible for Plaintiff accepting the bundle package.

95.     Defendant failed to include all information regarding pricing and billing in

its verbal offer.  Information was omitted from the sales pitch, either because the sales

agent wished to present the price as low as possible to land the sale, or because the system

itself does not provide all of the needed information, or CenturyLink's agreement with

DirecTV failed to provide all the information contained in DirecTV's pricing plan.  An

example is set forth below in the following paragraph.

## BREACH OF CONTRACT

96.    Defendant, CenturyLink and CTC, as agents for DTV, entered into a contract on behalf of DTV, acting as its agent to sell its product, satellite television. Said Defendants promoted fixed monthly rates for certain stand - alone  and bundled services, including high-speed internet and local and long distance telephone services. While the Company routinely promoted its simple, low rates to customers, it was fully aware that those low rates would not be delivered.

97.    Same was evidenced by the fluctuation in monthly billing costs.  Plaintiff had contracted with the Defendant for a pricing plan, where the rate was to remain fixed for the life of the contract.

98.    Plaintiff received an offer for services from Defendant, agreed to pay, and did pay  Defendants (CL & CTC) for the provision of services and products at agreed upon costs. In doing so, Plaintiffs entered into a contract with Defendant.

99.    Plaintiff and Defendant modified the original contract or entered into a new contract when services for DirecTv were added and a bundle price was offered to and accepted by Plaintiff.

100.    Defendant, Central Telephone Company expressly and/or impliedly agreed to bill and collect only for authorized charges, either for itself or DirecTV, due to its agency relationship.

101.    Defendant, CTC/CL, breached these obligations by billing and collecting

more than the amount  agreed upon, billing for unauthorized charges, and by providing bills that were unclear and misleading.

102.    Defendant's (CTC, CL, and DirectV's) acts, imposing unauthorized charges on Plaintiff's accounts was intentional and willful.

103.     Defendant (CTC & CL) routinely overcharged Plaintiff in breach of its offer and contract, implied or express.

104.    Defendant (CTC, CBS,  & CL)  failed to deliver telephone or internet services and related products at the promised price, both prior to the addition of DTV services and after. Plaintiff was charged excessive amounts for which Plaintiff did not agree to pay.

105.    Consequently, Plaintiff was charged improper termination fees for products that were terminated, for both CTC and DirecTV.  Therefore, the  Defendant caused her account to prematurely be sent to collections when Plaintiff refused to pay wrongfully assessed fees, which exceeded the amounts contracted for or which were billed after Plaintiff terminated telephone, internet, and satellite services.

106.    Defendant was not authorized or justified in charging Plaintiff for unauthorized amounts.

107.    Defendant's conduct in breaching the contracts in the above-described manner was not isolated but was rather systematic, pervasive, persistent, and a direct result of business policies and practices implemented to maximize Defendant's

revenue. Plaintiff contends that such a finding or admission has been made in the

Minnesota litigation.

108.    Plaintiff was injured, harmed, and incurred financial loss by way of

Defendant's above-described conduct in amounts to be determined at trial.

109.    Plaintiff was under duress to pay the improper amounts on threat of

having her essential services cancelled and/or interrupted.   Plaintiff' refusal to pay the

unauthorized charges resulted in a dispute, which ultimately led to a termination in

services from the only carrier in the area which could provide telephone service, either

due to noncompete contracts entered into between CenturyLink and other corporations

and/ or because CenturyLink held a  monopoly on the provision of telephone services in

West Columbia, Texas.  This "monopoly" resulted in  the closing of Plaintiff's business.

110.    An implied covenant of good faith and fair dealing is part of all contracts.

Defendant breached its contractual obligation of good faith and fair dealing, implied in all

contracts, by billing and collecting for unauthorized charges.

### BREACH OF FAIR DEBT COLLECTION PRACTICES AND FAIRE CREDIT REPORTING LAWS

111.    For purposes of this litigation, Plaintiff was a consumer.  She contracted

Defendants, CL, CBS, and/or CTC for the provision of telephone services.  At some

juncture, CTC/CL offered satellite services as part of the telephone service package,

previously provided to Plaintiff.  Plaintiff accepted said offer.

112.    Defendants CTC,CL, and CBS breached said contract by failing to provide

services at the contracted for rate and for failing to terminate telephone and satellite services, as requested and when requested by the Plaintiff.

113.    Defendant breached the contract with Plaintiff by refusing to terminate her telephone services when directed and as directed, thereby causing Plaintiff to incur additional charges beyond the date that Plaintiff requested that her services (telephone, internet, and television services) be terminated.   Plaintiff consequently refused to pay same.

114.    Defendants A T & T, DirecTV, or CTC or CBS sent the account to collections with both Sequiem Asset Solutions (hereinafter referred to as Sequiem) and Credence Management (hereinafter referred to as Credence), making it appear that the collection was for two separate accounts, when same was for the same account.

115.     Plaintiff and DirecTV allegedly resolved its dispute, after Plaintiff's request for arbitration on or about May 29, 2020.  In response thereto, DirecTV left a voice mail message that the account had been zeroed out.  However,  Plaintiff was subsequently  contacted by A T & T, stating that a balance was due and owing to ATT. Plaintiff did not have an account with A T & T.  Current account information reveals a sum greater than that.

DTV's failure to honor the agreement to -0- out the account in lieu of arbitration, constitutes a breach of contract and a breach of implied contract in that:

116.    Plaintiff would show that the debt was not owed, that the matter had been

allegedly resolved per DirecTV, and that reporting of same violated the **Fair Credit Reporting Act**,  while attempts to collect said debt violated the **Fair Debt Collection Practices Act.**

117.    Prior to all Defendant's placing the information on Plaintiff's credit report, Plaintiff was made an offer for a signature loan from her credit union.   Upon later attempting to accept the offer, said offer  was withdrawn and the signature loan was denied due to the information placed on Plaintiff's credit report by Sequeim and/or Credence on behalf of the other Defendants, as contained in the denial letter.

118.    DTV or ATT (creditor) furnished information to its debt collector (agent) . 15 U.S.C. §1681s-2 prohibits the furnishing information that the furnisher knows or has reasonable cause to believe that same is inaccurate.

119.    When information is inaccurate, incomplete, or cannot be verified, the CRA or debt collector must notify the creditor and cease reporting that information. 15 U.S.C. 1681s-2(a)(1)(A).  CRM did not ,in contravention of the referenced statute.

.    120.    Though notified that the debt was inaccurate, Defendants DTV, ATT, and CRM failed to investigate the alleged debt or dispute in contravention of 1681s-2(a)(3). The Fair Credit Reporting Act requires creditors to correct erroneous information promptly.

121.    Moreover, CRM and Sequeim must furnish to a credit reporting agency when the consumer disputes the accuracy of the information 1681s-2(a)(3).  These

Defendants failed to do so, in contravention of the referenced statute.

122.    The inability to obtain a loan at the time sought, was critical as Plaintiff was in the middle of a remodel and rehab project on her home and another property.  Renovations had already begun at the time that the loan denial had occurred, after a previous preapproval.  Same resulted in damage to her rehab project in an amount in excess of $50,000.00 and to her home in an amount equal to or more than $50,000.00. The inability to complete one project led to the inability to sell her home, as planned, which would have netted Plaintiff an amount in or around $250,000.00-$325,000.00.

123.    The account(s) were sent to collections by either DirecTV or  A T & T. Plaintiff is uncertain whether the billing was contained on both the billing records of Defendants CTC.CL, as well as ,, DirecTV's, and or A T & T's.  In any event, same in contravention of the "post arbitration response" in which DTV did not go to arbitration, but rather agreed to remove the balance from the account.

124.    In addition thereto, both Credence Management and Sequeim reported the accounts as due and owing, therefore reporting two negative credit accounts for the same transaction(s)- the alleged DirecTV balance.

125.    It is a violation of the **Fair Credit Reporting Act**  to report an invalid and an incorrect account.  It is further a violation of the law to indicate that a matter is resolved, with the alleged creditor owing nothing and  yet report same as a delinquent account.  Both acts are violative of 15 U.S.C. § 1681 et seq.  Defendants, Sequiem and

Credence did so, in contravention of the information provided by Plaintiff indicating the dispute of the account(s).

The information obtained to report the invalid account came from the creditor, DirecTV or its parent company AT & T or TPG VIII Merlin Investment Holdings, L.P. When information is obtained from the creditor for reporting to a CRA (Consumer Reporting Agency), the information must be accurate and complete. 15 U.S.C. § 1681s-2(a)(2). Moreover, Defendant DirecTV and A T & T was required by statute to report a dispute of the account, as well as the fact that the account was voluntarily closed but failed to do so in contravention of 15 U.S.C. § 1681s-2(a)(4). Therefore, DTV & ATT violated the law and breached said provisions, resulting in harm to the Defendant.

126.    Defendants (ATT, DTV, CRM, and Sequeim) a) failed to follow procedures to ensure maximum possible accuracy; 2) the consumer report contained an inaccurate entry; 3)The consumer Plaintiff suffered injury; 4) the injury was caused, in part, by the inaccuracy.

127.    Moreover, Plaintiff never had a contract nor did business with A T & T. Therefore, A T & T improperly reported a debt to a credit reporting agency, when no debt was owed to it and there was no privity of contract between Plaintiff and A T & T.

Plaintiff would show that A T & T, therefore:

a.      provided inaccurate information credit information to its collection agent which was subsequently reported  to a CRA; Same was at the behest or

direction of ATT.

b.    Plaintiff notified CRA, Credence Resource Management, Sequeim and AT & T that the information reported by the alleged creditor, Defendants A T & T and DirecTV was false.

c.    the CRA reported the information to the creditor of said dispute;

d.    Moreover, Plaintiff reported the discrepancy and problem with Sequeim who allegedly returned the debt to AT & T.

e.    after receipt of the information, the creditor failed to conduct a reasonable investigation and provide notice to the CRA to correct the reporting error.

Plaintiff further alleges that an agency relationship existed between the Defendants A T & T and DirecTV (as principal) with Sequeim and Credence Resource Management, as agents or debt collectors.  Said relationship involved collecting debts allegedly owed to A T & T and/or  DirecTV by Sequeim and Credence and further reporting that information to credit reporting agencies on behalf of ATT, DTV, or CTC.

128.    Defendant's (CTC or CBS, AT & T, and DirecTV)  use of different collection company's  reporting of the same debt as a new and different debt is also violative of the both the **Fair Credit Reporting Act** and the **Fair and Accurate Credit Transaction Act.**  Additionally, calls related thereto from collections for all three entities constituted a violation of the **Fair Debt Collection Practices Act** 15 U.S.C. 1692.

129.    **The Fair Credit Reporting Act**  15 U.S.C. 1681 et seq mandates  fair and

accurate credit reporting.  It also mandates that a report contain information that a consumer closed an account 15 U.S.C. 1681 § (e) , as well reporting when there is a dispute of an account by the consumer.  15 U.S.C. 1681 § (f) .

130.    Defendants Sequeim and Credence failed to validate the information provided by the Plaintiff, failed to remove it from her credit report, and failed to notify Plaintiff of Defendant's reporting said  information of a delinquent account on Plaintiff's credit report  (as the notice was obtained from another source), nor did it investigate the dispute prior to reporting same in contravention of the statute.  Sequeim and Credence, on behalf of Defendant's ATT and DTV violated the FRCA and FACTA.

131.    Moreover, after discussion of the account, the Defendant Sequeim or Credence stated that it was returning the account to DirecTV, only to remove the account and again place it on Plaintiff's credit report.  Notice was provided to Plaintiff that Sequeim returned the account to DirecTV, nevertheless, DirecTV or AT & T placed the account for collections on Plaintiff's credit report a second time, with knowledge of the falsity of the information and/or the dispute regarding same.

Defendants DirecTV and A T & T are therefore culpable for any improper reporting, as said entities provided their collection agencies with said information.

132.    Most recently, Defendant, Credence Management has reported the account as a delinquent account.

133.    To date, Plaintiff has not received notification of reinvestigation, correction,

nor deletion of the inaccurate information reported on her account by Defendants.

134.    As a result, Plaintiff's credit score decreased approximately 50 or more  points.

135.    Defendants failure to accurately report, investigate, and remove the information resulted in a decrease in Plaintiff's credit score, the denial of a loan, and resulting damage to her home and other building projects, resulting in a loss in excess of $50,000.00 (loan amount) coupled with inability to move and sell property, resulting in an aggregate loss in excess of $300,000.00.

## TEXAS DECEPTIVE TRADE PRACTICES ACT

136.    Plaintiff would show that in addition to being  subjected to fraud, fraudulent inducement, breach of contract, etc., as set out supra, she has also been subjected to the following  violations of the *Texas Deceptive Trade Practices Act*  as found in the **Texas Business and Commerce Code** §17.46.   Plaintiff contends that the provisions outlined below occurred in the instant case, by the collective acts of the Defendants or with said individuals acting individually.

The *Texas Deceptive Trade Practices Act* provides in pertinent part:

> Sec. 17.46.  DECEPTIVE TRADE PRACTICES UNLAWFUL.  (a)  False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

137.    Pursuant to **Texas Business & Commerce Code** §17.50, when a

Defendant takes any of the foregoing actions, or a Plaintiff relies on the Defendants

assertions to his detriment, or the Defendant engages in unconscionable conduct and does

so willingly and knowingly, the Plaintiff is entitled to treble damages.

138.    Defendants have violated the ***Texas Deceptive Trade Practices Act***

( hereinafter referred to as DTPA) in the following respects:

a.    Specifically, Defendant, CTC or CBS advertised telephone services, with

intent not to sell them as advertised, as set forth supra.  According to supervisors, the

"bundle" price offered (price reduction) could not be provided.  Therefore, the Defendant

denied that such an offer was made in violation of said act with respect to **DTPA** §17.46

b (11) of the act.

b.    CTC, CL, or CBS represented that it had authority to set the price for

the selected packages and to provide services for its customers, with all authority

regarding services issues, billing problems,[16] etc. being handled by CTC, CL, and CBS

acted individually, and as agent for DTV regarding these services in violation of **DTPA**

to **DTPA** §17.46 b §§ b (1)(2).

Moreover, CTC, CBS, or CL passed off goods and services of DTV, as those of

CL or CTC.

c.    In addition thereto, CTC or CBS offered bundle pricing, indicating that it

---

[16]  Because CL referred Plaintiff to DTV for billing disputes, it must be presumed
that it lacked much of the authority that it indicated that it had during the sales process for
said services.

had the authority to offer the bundle, including both its services and that of DirecTV in violation of **DTPA** 17.46 §§ b (1)(2)(12)(14).

        d.      As heretofore set out, CL, CTC or CBS offered a bundle package and contracted individually and on behalf of DTV, as its agent, for the bundle package without the intent to honor the contract pricing agreement as it billed for add on fees (such as a sports fee) and taxes, which it failed to disclose, indicating after billing (upon Plaintiff's query) that same was required by DTV in violation of the **DTPA** 17.46 §§ b (1)(2)(9)(11)(24).

        e.      Additionally, a CL, CTC or CBS supervisor indicated that the sales person lacked the authority to sell a bundle package and attempted to renegotiate the package rate at a much higher rate than the amount contracted for in violation the **DTPA** 17.46§ b (14).

        139.   In addition to the foregoing violations, DTV violated the DTPA by passing off goods and services as those of CL (1), CTC, or CBS or by causing confusion or misunderstanding regarding the source of sponsorship or approval regarding pricing, charges, and fees (2) and by representing that an agreement with CTC or CL involved rights and remedies, or obligations which it did not have or involve (12) and that it failed to disclose information concerning goods or services which was known at the time of transaction if such failure to disclose was intended to induce the consumer into a transaction.

140.    Apparently, in having its (DTV's)  agent, CL, contract for services on its behalf, the parties conspired or agreed to not disclose certain fees or charges (regional sports fee; protection plan, etc) to fraudulently induce persons to obtain its satellite services.

141.    Because the actions of Defendants, CL,CTC or CBS and DVT/ATT were knowing and unconscionable, the Plaintiffs are entitled to treble damages as provided for by the Texas Deceptive Trade Practices Act as codified in the  **Texas Business & Commerce Code** §17.46. By terms of its contractual or agency agreement, said Defendants (ClnCBS, CTC- ATT & DTV) offered  services jointly to Plaintiff, Davis, as a consumer, while making Plaintiff contractually liable to two parties for the same service.

Additionally, at the time that Plaintiff contracted for said services, she was not informed that other fees were necessary to be afforded the bundle package with DTV, for example, the regional sports fee.  Neither CTC, CL, CBS, ATT, or DTV disclosed said information in contravention of DTPA 17.46 §§ 11, 12, 24.

Plaintiff notified DTV of its claims pursuant to the **Texas Business and Commerce Code ,** as provided in its demand letter prior to filing suit, required pursuant to this act.  (See Exhibit F, attached and incorporated by reference, the same as if fully copied and set forth herein.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays for damages as set out below :

1.   Plaintiff, Jeff Kitchen is entitled to a sum to be determined at trial, but which is in excess of $1,000,000.00 for the recovery of damages he would in all likelihood have received had his case not been impaired by the actions of Defendant.

2.   Plaintiff, Charlie Brown Heritage Foundation is entitled to a sum to be determined at trial, but which is in excess of $600,000.00 for the damages it would in all likelihood have received had his case not been impaired by the actions of Defendant;

3.   Plaintiff's  loss of attorney's fees as a result of dismissal of the afore-mentioned cases in an amount to be determined at trial, but which exceeds $810,000.00.

4.   Plaintiff's loss of income for not having telephone, internet, and fax services in an amount in excess of $1,000,000.00 from the date of cessation of services through the present;

5.   Damages to Plaintiff's  credit rating;

6.   Damage to her reputation for having been insulted by the Court and   having

same published, as a result of not submitting documentation in a timely

fashion due to lack of proper internet services.  Said damages are in excess

of $5,000,000.00.

7.    Damage to her properties' renovation project and to her home, due to

failure to procure loan proceeds or settlement proceeds which would have

allowed her projects to continue in an amount to be determined by the jury,

but which exceeds $300,000.00.

8.    Any and all sums due for overbilling, but an amount in excess of $1200.00;

for costs incurred to date due to improper current billing;

9.    All appellate costs as a result of the dismissal of cases for the Plaintiffs, Jeff

Kitchen and the Charlie Brown Heritage Foundation. in the approximate

amount of $15,000.00.

10.   All damages resulting from statutory violation of the statutes cited herein;

11.   Mental pain and anguish (emotional distress) due to inability to perform the

essential functions of Plaintiff's job, due to ineffective telephone and

internet service; loss of reputation, and loss of property

12.   Mental pain and suffering of all Plaintiffs.

13.   Punitive damages for the willful acts of Defendants.

14.   All statutory damages allowed by law;

15.   For such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

/s/ V.L.Davis

Veronica L. Davis
Fed. No. 29717
226 N. Mattson
West Columbia, Texas 77486
(979) 248-4583 (Cell)
vld57atal@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Amended Original

Complaint has been sent to all opposing counsel via efiling on this the 1st day of August,

2022.

/s/ V/L/Davis